776 July 29, 2026 No. 710

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

NICHOLAS ANDREW PLEASURE,
*Defendant-Appellant.*

Washington County Circuit Court
22CR26375; A181739

Erik M. Buchér, Judge.

Submitted April 23, 2025.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Marc D. Brown, Deputy Public Defender, Oregon Public Defense Commission, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Robert A. Koch, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Powers, Judge, and Pagán, Judge.

PAGÁN, J.

Affirmed.

## PAGÁN, J.

Defendant appeals from a judgment of conviction related to a series of domestic assaults against his then girlfriend. He raises three assignments of error. In his first assignment of error, defendant asserts that the trial court erred when it denied his motion for a judgment of acquittal (MJOA) on a charge of strangulation, ORS 163.187, because his girlfriend only alleged that her breathing had been 20 percent blocked. In his second assignment of error, defendant asserts that the trial court erred when it admitted evidence of his prior misdemeanor domestic violence (DV) convictions. In his third assignment of error, defendant asserts that the trial court erred when it declined to give a witness false in part (WFIP) instruction. We conclude that the evidence of only partial loss of breathing or circulation was sufficient to support the factfinder's verdict. Second, we conclude that the trial court did not err by admitting defendant's prior convictions, because the Supreme Court's decision in *State v. Aranda*, 372 Or 363, 550 P3d 363 (2024) (OEC 403 balancing is not required for certain offenses) applies to OEC 609(2) offenses, and that even if it does not, the same reasoning applies. We also conclude that the trial court did not err by declining to give the WFIP instruction because there was insufficient evidence that the witness's testimony was inconsistent. We thus affirm.

## I.   BACKGROUND

Although defendant was charged with seven counts, a jury found him guilty on only three counts, and the remaining counts are not pertinent on appeal. The jury found defendant guilty of Count 3 (assault in the second degree constituting DV, under ORS 163.175), Count 4 (strangulation constituting DV, under ORS 163.187), and Count 5 (assault in the fourth degree constituting DV, under ORS 163.160). We relate only the facts of the counts on which he was convicted.

Defendant and S were dating and lived together. On June 1, 2022, they had come home from a night out when defendant became irritable and they began to argue. Several alleged DV incidents occurred around that time, but

the jury found defendant not guilty of those events. S left home and came back the next day to prepare to go to work.

Defendant began arguing with her, which culminated in him slapping her across the face, which caused her to then hit her head on the wall.[1] S then went to a different room to take a shower, where the altercation continued. S ended up on the floor; she could not remember how she got there. Defendant put S's face down on the floor, put his hand on her neck, and hit her head on the floor three times. Defendant gripped S's neck, which, according to S, reduced her breathing by 20 percent, caused her vision to go "white and black," altered her hearing, and left her with a swollen neck, painful swallow, hoarse voice, and dry cough. S then took a shower and texted her ex-husband to ask him to call her, which he did; her ex-husband then called police. Officer Jason Christiansen arrived and interviewed S, who related a rough version of the above events. Those incidents became the basis of Counts 3, 4, and 5.

A paramedic treated S. S reported severe neck, jaw, and head pain, and that the pain was a ten out of ten on a subjective pain scale. She was taken to the hospital and administered oxycodone and fentanyl. At the hospital, nurse Katie Schafer evaluated S and documented her injuries. S reported at that time that her pain was between a zero and a four, depending on the injury.

The day after the injury, S gave an interview to Officer Nichole Mitchell. She reported that the pain in her neck and head was ten out of ten, that her jaw pain was an eight, that her spine pain was a seven, and her esophagus was a five. A week after the incident, S testified to a grand jury that her head pain remained a ten. S was not taking pain medication at the time of the grand jury hearing. It was unclear if she was on medication at the time she was interviewed by Officer Mitchell.

After defendant decided to testify, the state moved to allow impeachment of defendant by admitting evidence of his prior DV misdemeanor convictions under OEC 609(2).

---

[1] Defendant admitted to her head hitting the wall but was not convicted for second degree assault in that incident.

Defendant contested the admission of those convictions and argued that the trial court was required to balance the convictions under OEC 403. Based on the law at the time, the trial court performed OEC 403 balancing and allowed two of defendant's prior three DV convictions to come in; the remaining conviction was older than 15 years and the state agreed not to offer it. Defendant testified at trial. During his testimony, defendant admitted he had committed fourth degree assault, and narrated the slap incident in detail, but contested the remaining charges, including the strangulation. The state impeached his testimony by cross-examining him regarding his prior conviction for assault in the fourth degree constituting domestic violence.[2]

## II.  ANALYSIS

### A.  *MJOA on Strangulation*

In his first assignment of error, defendant asserts that the trial court erred when it denied his MJOA on Count 4, strangulation. As relevant here, ORS 163.187 provides:

"(1)   A person commits the crime of strangulation if the person knowingly impedes the normal breathing or circulation of the blood of another person by:

"(a)   Applying pressure on the throat, neck or chest of the other person; or

"(b)   Blocking the nose or mouth of the other person."

The statute does not include a definition of the term "impede." Defendant argues he did not "impede" S's breathing by reducing her ability to intake air into her lungs by 20 percent. Defendant's argument thus requires us to apply statutory construction to the term. Defendant argues that the legislature intended the statute to apply only to matters of asphyxiation, and that a 20 percent reduction in breathing was not serious enough to be asphyxiation. While the state addresses the statutory analysis, it also argues that the additional facts of defendant's hard grip on S's neck, which caused her vision to go "white and black," altered her hearing, and left her with a swollen neck, painful swallow,

---

[2]  The prosecutor asked, "you've been convicted of assault in the fourth degree constituting domestic violence before?", to which defendant answered "Yes."

hoarse voice, and dry cough, was sufficient evidence of strangulation.

When our "review of a ruling on a motion for a judgment of acquittal centers on the meaning of the statute defining the offense, the issue is one of statutory construction that we review for legal error." *State v. McQueen*, 307 Or App 540, 544, 478 P3d 581 (2020) (internal quotation marks omitted). After construing the statute, we review the facts in the light most favorable to the state to "determine whether a rational trier of fact could have found that the essential elements of the crime had been proved beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

"In the construction of a statute, a court shall pursue the intention of the legislature if possible." ORS 174.020. When interpreting the meaning of a statute, text and context are the first layer of analysis. *State v. Gaines*, 346 Or 160, 164, 206 P3d 1042 (2009); *see Benjamin v. O'Donnell*, 372 Or 764, 769, 557 P3d 1089 (2024) (applying the statutory analysis framework).

When undefined in a statute, we assume, at least initially, that the legislature intended the "plain, natural, and ordinary" meaning of a word. *DCBS v. Muliro*, 359 Or 736, 746, 380 P3d 270 (2016) (exploring a dictionary definition as part of the text and context analysis). "We do not, however, interpret statutes solely on the basis of dictionary definitions—we examine the use of the word in context." *State v. Amoroso*, 336 Or App 732, 737, 562 P3d 641 (2024) (internal quotation marks omitted).

To impede is "to interfere with or get in the way of the progress of : hold up : block" or "detract from." *Webster's Third New Int'l Dictionary* 1132 (unabridged ed 2002).[3] To breathe is, as relevant here, to "to draw air into and expel it out of the lungs : inhale and exhale : RESPIRE (2) : to take in oxygen and give out carbon dioxide through natural processes that resemble or analogous to breathing." *Webster's* at 273. Circulation is, as relevant here, "the movement of blood

---

[3] In *State v. Silver*, 335 Or App 377, 559 P3d 431 (2024), we concluded that a defendant had not impeded traffic when he was merely on the side of the road. *See also State v. Balero*, 287 Or App 678, 682, 402 P3d 739 (2017) (applying *Webster's* definition of impede).

through the vessels of the body that is induced by the pumping action of the heart and serves to distribute nutrients and oxygen to and remove waste products from all other parts of the body." *Webster's* at 409. A plain reading of the text of the statute favors the state's interpretation, *i.e.*, that even a partial blockage of breathing or circulation is sufficient to meet the statute's requirements.[4]

The parties have not provided any contextual statutes, such as definitions, and we could not identify any relevant statutory context either. We have, however, previously interpreted other aspects of the statute. "As we interpret [ORS 163.187(1)], it does not prohibit only 'impeding.' Rather, the conduct the strangulation statute prohibits is set out in the entire verb phrase—impeding another person's normal breathing or circulation." *State v. Dowd*, 342 Or App 57, 70, 575 P3d 166, *rev den*, 374 Or 421 (2025). That prior conclusion provides a wide view of strangulation as a context for the term impede, one which does not merely examine the reduction in breathing.

After examining text and context, we may examine proffered legislative history "for whatever it is worth—and what it is worth is for the court to decide." *Gaines*, 346 Or at 173; *see also* ORS 174.020(1)(b) ("To assist a court in its construction of a statute, a party may offer the legislative history of the statute."); ORS 174.020(3) ("A court may limit its consideration of legislative history to the information that the parties provide to the court. A court shall give the weight to the legislative history that the court considers to be appropriate.").

Defendant points to testimony from one of the main witnesses at the legislative hearings for House Bill (HB) 2770 (2003), medical examiner Kris Karcher: "Strangulation is the act of asphyxiation, and you become asphyxiated by two methods. One is to inhibit the blood flow to and from the brain, and the other is to obstruct the airway, not allowing

---

[4] Defendant additionally points to a dictionary definition of strangulation. The legislature however has purposefully defined strangulation. Still the legislature's definition is not incompatible with the dictionary definition: "inordinate compression or constriction of a tube or part (as the throat or bowel) esp. to a degree that causes a suspension of breathing, circulation, or the passage of contents." *Websters* at 2256.

air or oxygen to the brain as well." Audio Recording, House Committee on Judiciary, HB 2770, Mar 13, 2003, at 6:03 (statement of Kris Karcher, Coos County Chief Deputy Medical Examiner) https://records.sos.state.or.us (accessed June 24, 2026). Defendant argues that a 20 percent reduction in breathing is not asphyxiation. The state points to other testimony from Karcher, wherein she discusses strangulation being on a continuum between mere touch and death. *Id.* at 10:12.

One other aspect stands out from Karcher's testimony. She described the layout of the carotid and jugular arteries in the neck and testified that it takes about a third as much force to obstruct blood flow as it does airflow. *Id.* at 7:45. Thus, the same amount of pressure applied to an artery has greater effect than the same amount of pressure applied to the airway. We do not think it possible for a victim, absent serious medical training or diagnostic assistance, to quantify the reduction in circulation. Thus, the likeliest evidence is going to be the symptoms that the victim reports.

Other testimony addressed less serious instances of strangulation, such as cases where victims did not have visible injuries or did not lose consciousness. *Id*. at 33:30 (statement of Maile McClusky, victim advocate). The legislative history supports a broader understanding of strangulation than just the loss of airflow. It reflects that the legislature was aware of the continuum of strangulation and yet still chose broad language.

Based on the text, context, and legislative history of ORS 163.187, we conclude that strangulation that is less than a total blockage of airflow or circulation may qualify as the crime of strangulation. Further, there is not a strict percentage-based test for the reduction of airflow or circulation that qualifies as strangulation, and a combination of airflow and circulatory factors may be considered. That is not to say that there may not be some *de minimis* conduct that would not qualify as impeding, but we need not reach that issue today because the evidence clearly overcame the level of proof to withstand an MJOA.

A judgment of acquittal is appropriate if the evidence is insufficient to support a verdict. *State v. Cunningham*,

320 Or 47, 61-62, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995); *State v. Newkirk*, 319 Or App 131, 133, 509 P3d 757, *rev den*, 370 Or 214 (2022). We review questions of the sufficiency of the evidence in a criminal case following a conviction by examining the evidence in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt. *Cunningham*, 320 Or at 63. Our decision is not whether we believe that defendant is guilty beyond a reasonable doubt, but whether the evidence is sufficient for the factfinder to so find. *Id*. We have rejected the argument that circumstantial evidence may never be sufficient to convict. *Id*.

Here, there was sufficient evidence that defendant impeded S's normal breathing or circulation of blood given defendant's grip on S's neck, which reduced her breathing by 20 percent, caused her vision to go black and white, altered her hearing, and left her with a swollen neck, painful swallow, hoarse voice, and dry cough. As discussed above, the evidence of a loss of circulation may also be considered. While S could testify to the percentage loss of her airflow, she of course could not testify to the level of circulatory impairment. But a factfinder could consider the fact that S's vision went black and white as evidence that she was losing blood or oxygen to support her vision, which may have evinced additional circulatory impairment. *See Dowd*, 342 Or App at 70 (stating that "the conduct the strangulation statute prohibits is set out in the entire verb phrase—impeding another person's normal breathing or circulation"); *see State v. Alcon-Ayala*, 345 Or App 514, 523, 583 P3d 333, *rev den*, 375 Or 332 (2025) (holding that evidence of bruising, neck pain, memory loss, and bleeding were sufficient evidence of strangulation, even though the victim could not directly testify whether her breathing or circulation had been impeded because she could not recall the incident).[5] The trial court did not err by denying the MJOA on Count 4.

_____

[5] Here, we also note that S could not remember how she ended up on the floor. The parties did not argue that fact to us, and there was sufficient evidence even absent it. However, a factfinder could have concluded that S could not remember how she got on the floor because she had been strangled.

B.  *Prior Convictions*

In his second assignment of error, defendant asserts that the trial court erred when it allowed evidence of two prior convictions for fourth degree assault under OEC 609(2), which allows for the admission of certain prior misdemeanor DV convictions if the defendant is charged with an enumerated DV offense. Defendant argues that the court abused its discretion by allowing the convictions in under OEC 403. The state counters that OEC 403 balancing is not required because defendant testified, thus the convictions were for impeachment purposes, and *State v. Aranda*, 372 Or 363, 550 P3d 363 (2024) (*Aranda II*), should apply.

In *Aranda II*, the Supreme Court held that due process concerns did not require OEC 403 balancing for admitting a prior felony conviction under OEC 609(1). *Aranda II*, 372 Or at 387. The state argues that *Aranda II* did not limit its holding to merely OEC 609(1) and also covered OEC 609(2). The state argues that in any event, the same logic applies to OEC 609(2). Defendant filed his opening brief after we decided *State v. Aranda*, 319 Or App 178, 509 P3d 152 (2022), *rev'd*, 372 Or 363, 550 P3d 363 (2024) (*Aranda I*), but before the Supreme Court reversed it. Defendant did not file a reply brief or address *Aranda II* in supplemental briefing.

Having reviewed *Aranda II*, we agree that the Supreme Court intended for its ruling to apply to all of OEC 609. Although the court's focus was on OEC 609(1), the court's final pronouncement referred to the whole of OEC 609. The court concluded, "we are not persuaded by defendant's argument that the Due Process Clause requires trial courts to conduct OEC 403 balancing before admitting a criminal defendant's conviction history as impeachment evidence under OEC 609." *Id.* at 383.

Even if the Supreme Court did not intend for its holding to cover OEC 609(2), we see no reason why its logic regarding OEC 609(1) would not extend to OEC 609(2). In *Aranda II*, the court first concluded that OEC 609 does not, under its own terms, allow for OEC 403 balancing of evidence, adhering to its ruling in *State v. King*, 307 Or 332,

369, 768 P2d 391 (1989).[6] Then, the court examined whether federal due process demands such balancing. Pointing to several United States Supreme Court decisions, the court noted that the United States Supreme Court had at times pointed to the importance of discretion in prior conviction admission. *Id.* at 373. The court determined that those cases did not answer the question and turned to fundamental principles of due process, including historical practice and fundamental fairness. *Id.* at 374.

The court concluded that balancing offenses was not historical practice, and that even pardoned persons could have their conviction used as impeachment. *Id.* at 375. The court also pointed to FRE 609, which does include a balancing test, and noted that its adoption was the result of a political battle, but that the judicial decisions leading to its creation did not support that there was an intrinsic right to balancing. *Id.* at 378. We note that some parts of the court's history analysis were limited to felonies, but otherwise, many of its conclusions applied to both misdemeanors and felonies. The court also noted that it was typical prosecutorial practice around the time of the adoption of FRE 609 to admit into evidence all but minor misdemeanors. *Id.*

The court then discussed fundamental fairness. *Id.* at 382. There are limitations on what information may be elucidated under OEC 609. "[I]mpeachment evidence is subject to restrictions intended to limit the potential for abuse by the state or misuse by the jury." *Id.* Further, limiting instructions serve to ensure that juries use the evidence for the proper purpose. *Id.* Most importantly, the court pointed out that OEC 609 only applies if the defendant has chosen to testify. *Id.* The court concluded that those factors made it so that the United States Supreme Court would be "unlikely to conclude that impeaching criminal defendants with prior felony convictions is so extremely unfair as to violate fundamental conceptions of justice or that doing so would so infuse the trial with unfairness as to deny due process of law." *Id.* at 382 (internal quotation marks omitted).

---

[6] OEC 609 previously did require such balancing but was removed by voter referendum in 1986. Or Laws 1987, ch 2, § 9.

All of those rationales apply equally to OEC 609(2) as they do to OEC 609(1). Nor does the plain text of OEC 609(2) provide for balancing. We see no reason to believe that the Supreme Court did not intend *Aranda II* to apply to OEC 609(2), and even if it did not, its reasoning in *Aranda II* extends to OEC 609(2).

Therefore, we conclude that under *Aranda II*, the trial court was not required to perform OEC 403 balancing for admission of a prior conviction under OEC 609(2). Here, the trial court did perform such balancing—which defendant argues was done improperly. But the trial court did not err by admitting evidence of defendant's prior misdemeanor DV convictions when he was on trial for an offense enumerated under OEC 609(2)(b), because OEC 403 balancing was not required in the first instance.

C.  *Witness-False-in-Part Jury Instruction*

In his third assignment of error, defendant asserts that the trial court erred when it declined to give his requested WFIP instruction. He argues that S's answers about how much pain she had experienced were inconsistent and he was entitled to a WFIP instruction.

The state argues that the contention regarding the WFIP instruction was not preserved. We disagree. Defendant specifically requested a WFIP instruction, specified which witness warranted it, and provided the reasoning as to why he wanted that instruction (namely, S's testimony about pain levels). *Cf. State v. Paluda*, 341 Or App 741, 744, 575 P3d 200, *rev den*, 374 Or 616 (2025) (WFIP issue unpreserved where the defendant did not identify the particular witness or the particular inconsistency).

"The witness-false-in-part instruction is based on ORS 10.095(3), which provides that the jury is 'to be instructed by the court on all proper occasions *** [t]hat a witness false in one part of the testimony of the witness may be distrusted in others.'" *State v. Gocan*, 315 Or App 222, 227, 500 P3d 85, *rev den* 369 Or 211 (2021). The Supreme Court noted that:

"a 'proper occasion' to give the witness-false-in-part instruction exists when, considering the testimony and

other evidence a party has brought to the court's attention in support of the requested instruction, the trial court concludes that sufficient evidence exists for the jury to decide that at least one witness consciously testified falsely and that the false testimony concerns a material issue."

*State v. Payne*, 366 Or 588, 600, 468 P3d 445 (2020). We laid out the standard of review in *Gocan*:

"In considering the requested instruction, the trial court must view the evidence in the light most favorable to the requesting party. In that light, the evidence must amount to more than an honest mistake, confusion, or hazy recollection. The trial court's decision whether or not to give the instruction is a legal conclusion, and, on appeal, we apply a legal-error standard of review. Thus, the inquiry for us is whether the testimony and evidence, viewed in the light most favorable to defendant, is legally sufficient to support a finding that at least one witness testified falsely and, if so, whether that false testimony concerned a material issue. In conducting our inquiry, we focus on the testimony and evidence identified at trial by defendant as supporting the instruction."

315 Or App at 227 (internal citations and quotations omitted).

We conclude that, even viewing all evidence in favor of defendant, the evidence did not support a reasonable inference that S consciously testified falsely. At the time of the injury, S reported to a paramedic that the pain was a ten out of ten. A few hours after the injury, at the hospital, she reported her pain level as between a zero and a four out of ten, depending on the injury, when asked by nurse Schafer. The day after the injury, S testified that at least some of the pain remained a ten out of ten. S, a week later, testified to the grand jury that her pain remained a ten out of ten. Defendant argues that S's answer to the nurse is not consistent with her answers to the police, paramedic, and the grand jury, and thus there was clear evidence that she was lying. But the answer to the nurse was given after S had been administered several doses of fentanyl and oxycodone for pain.[7] S testified that she was not receiving pain

_____

[7] Defendant argues the nurse did not know whether S had been given pain medication. Whether the nurse knew is irrelevant though, as S's medical records thoroughly documented the timing of the various doses of pain medication.

medication at the time of the grand jury hearing. Even in the light most favorable to defendant, there was not sufficient evidence that S's testimony was inconsistent given the significant degree of pain medication she was administered at the hospital. Therefore, the trial court did not err in denying defendant's request for the WFIP instruction.

## III.   CONCLUSION

The trial court did not err by denying defendant's MJOA on Count 4, by admitting his prior convictions under OEC 609(2), or by declining to give the requested WFIP instruction.

Affirmed.